UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA    :
       :
       :
v.    :   Case No.:  8:25-CR-461-JSM-AEP
       :
       :
KEVIN CHARLES LUKE    :
_____ :

## DEFENDANT KEVIN CHARLES LUKE'S
## SENTENCING MEMORANDUM

COMES NOW, the Defendant, KEVIN CHARLES LUKE, by and through his undersigned counsel, and hereby files this his sentencing memorandum and in support states as follows:

## I.   Presentence Investigation Report

The Defendant has no objections to the factual accuracy of the pre-sentence investigation report.

The Defendant has no objections to the legal accuracy of the pre-sentence investigation report.

## II.   Sentencing Process

In order to arrive at a sentence that is sufficient but not greater than necessary, and to comply with the purposes set forth in paragraph two of Title 18 United States Code Section 3553(a), the Defendant understands this Honorable

Court will first calculate the Defendant's federal sentencing guideline sentence range, next consider any departures based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1, and, finally, consider whether the sentence imposed should be different from either the federal sentencing guideline sentence or the departure sentence (if any), after considering the factors set forth in 18 United States Code Section 3553(a).

- As indicated above, the advisory federal sentencing guideline range as calculated by United States Probation is accurate.

- It is currently unknown whether there will be any upward or downward departure motions based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1 at this time.

- In this submission, the Defendant posits there is a basis for a downward variance and discusses this request in the next section.

## III. Downward Variance Request

There is no doubt the Defendant committed the crimes charged in the indictment. The Defendant has accepted responsibility by pleading guilty to each charge in the indictment. The Defendant knows, and most importantly accepts, that now is the time that he must be punished for his criminal actions.

But as this Honorable Court certainly knows better than anyone, a federal sentencing is not designed to punish alone. If so, there would be no need for a

presentence investigation report, sentencing submissions by the parties and a sentencing hearing with argument and allocution. Instead, this Honorable Court would simply read the presentence investigation report's section on the federal sentencing guideline and via written order impose an imprisonment sentence within the accepted guideline range. It would be like 2004 and before, all over again - quick, painless, and expedient - for everyone but the Defendant.

But the Defendant, like all other federal defendants waiting to see how much of their lives will be taken[1] from them at sentencing, is exactly the person for whom an individualized sentencing is designed. The Defendant is more than just his criminal actions in this case. The totality of the Defendant's life, not just his criminal actions, deserves to be heard and considered.

It is the Defendant's belief that a guideline imprisonment sentence is insufficient, unreasonable, and thus greater than necessary under the law. The Defendant offers the following mitigation in support of his request for a downward variance.

<u>Title 18 United States Code Section 3553(a)</u>

The Title 18 United States Code Section 3553(a) factors that a sentencing judge must take into equal consideration to the federal sentencing guidelines are as follows:

---

[1] The Defendant earned time about to be taken from him. He is not innocent. But it is time taken from him just the same.

- The nature and circumstances of the offense and the history and characteristics of the defendant; 18 United States Code Section 3553(a)(1); and

- The need for the sentence imposed; 18 United States Code Section 3553(a)(2); and

  - to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
  - to afford adequate deterrence to criminal conduct.
  - to protect the public from further crimes of the defendant.
  - to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

- The kinds of sentences available; 18 United States Code Section 3553(a)(3); and

- The need to avoid unwarranted disparity among defendants with similar records and similar crimes; 18 United States Code Section 3553(a)(6); and

- The need to provide restitution to any victims of the offense. 18 United States Code Section 3553(a)(7).

Prior to the United States Supreme Court decisions in *United States v. Booker*, 543 U.S. 220, 245-67 (2005), *Rita v. United States*, 127 S.Ct. 2456 (2007), *Kimbrough v. United States*, 128 S.Ct. 558 (2007), and *Gall v. United States*, 552 U.S. 38, 53 (2007), the federal sentencing guidelines were mandatory, not advisory, on a federal sentencing judge. As we all know, because of the above

seminal cases, the federal sentencing guidelines are now advisory in nature and equal in weight to the Title 18 United States Code 3553(a) factors.[2]

## The History and Characteristics of the Defendant.
## 18 United States Code Section 3553(a)(1)

<u>Personal and Family Background</u>

Kevin Luke was born on April 19, 1963, in Indianapolis, Indiana, to Richard and Nancy, who were married at the time of his birth and remain married today. He is the eldest of five children, with two brothers and two sisters. Kevin was raised in a loving, stable household marked by strong family values and a consistent sense of security. He reports no history of abuse, neglect, or instability during his childhood.

Kevin's upbringing reflected a traditional, structured family environment. His parents, though they had limited formal education themselves, emphasized the importance of hard work, responsibility, and respect for education. His father worked in a blue-collar role as a mechanical engineer. The family lived modestly but never lacked necessities. Kevin recalls that there was always food, clothing, and a stable home, and he describes his parents as deeply loving, kind, and committed to raising their children with discipline, faith, and moral grounding. The

---

[2] Undersigned counsel is aware this Honorable Court is well-versed in this area of the law and will now move forward in this sentencing memorandum to an application of fact and law analysis as a result.

family was actively involved in church, which played a central role in Kevin's early development.

As the oldest child, Kevin assumed responsibility naturally and served as a steady presence for his younger siblings. He recalls a generally happy childhood, filled with ordinary experiences such as playing outside, riding bikes, attending school, and learning independence. He never ran away from home and describes his adolescence as typical, marked by birthdays, peer pressure, frustrations, and growing maturity. After graduating from high school, Kevin joined the military, motivated by a desire to serve and to continue his education.

Kevin has been married three times. His first marriage, at age twenty-one, was to his high school sweetheart. They were married for eighteen years and had two children together. Their marriage was grounded in shared faith and involvement in church, and their divorce was amicable, without conflict or violence. They remain on friendly terms.

In 2002, Kevin entered a second marriage with a woman he met during a church mission trip to Ukraine. She came to the United States on a temporary visa, but the marriage was short-lived. The couple sought an annulment, and she returned to Ukraine. The separation was mutual and without animosity.

Kevin's third marriage began in 2007. He and his former spouse have two sons, now ages sixteen and thirteen, and share joint physical and legal custody. The

divorce was high conflict and involved prolonged litigation and emotionally difficult custody disputes. Although Kevin and his ex-wife are not on friendly terms, they communicate civilly through a parenting application and prioritize their children's needs. Following the separation, Kevin sought counseling to ensure he could provide emotional stability and consistency for his sons. He reports maintaining a close and supportive relationship with all his children and grandchildren.

Kevin's primary source of emotional support is his father, who remains actively involved in his life despite living out of state. His father continues to provide guidance, encouragement, and steady support, particularly during periods of stress. Kevin also has a close-knit group of coworkers who function as an extended support system, offering regular encouragement and maintaining strong bonds of trust and mutual respect.

More recently, Kevin's daughter was diagnosed with lymphoma, which has progressed and requires ongoing treatment. This diagnosis has caused Kevin significant emotional distress as he supports his daughter through her illness.

*Analysis*

Kevin's personal and family history is directly relevant under 18 U.S.C. § 3553(a), which instructs the Court to consider the history and characteristics of the defendant when determining an appropriate sentence. Unlike many defendants,

Kevin's background reflects long-term stability, strong familial bonds, and consistent exposure to positive values rather than trauma or dysfunction.

His upbringing in a stable, supportive household shaped a life defined by responsibility, work ethic, and commitment to others. These formative experiences are reflected in his military service, his sustained involvement in family life, and his ongoing commitment to his children, even through difficult marital transitions. Kevin's response to adversity - seeking counseling, maintaining cooperative co-parenting, and prioritizing his children's well-being - demonstrates maturity and accountability.

Kevin's strong ties to family and community are particularly relevant to the district court's selection of an appropriate sentence. His ongoing role as a parent, his close relationship with his father, and his support network among coworkers all indicate that he is firmly rooted in pro-social relationships that reduce the risk of future misconduct. These factors weigh in favor of rehabilitation and stability.

The emotional strain associated with his daughter's serious medical condition further underscores the significance of Kevin's family responsibilities. Section 3553(a) permits the district court to consider the real-world impact a sentence will have on both the Defendant and those who depend on him. Kevin's presence and support during his daughter's treatment represent an ongoing responsibility that would be significantly affected by incarceration.

Kevin's background reflects a life largely characterized by lawful conduct, responsibility, and commitment to others. These characteristics support a sentencing approach that is sufficient but not greater than necessary to meet the goals of sentencing, particularly where accountability can be achieved without unnecessarily severing the family and community ties that have defined his life and continue to provide stability.

## Military Accomplishments

Kevin enlisted in the United States Army in April 1981, beginning a military career that spanned nearly four decades. Over the course of thirty-seven years of service, Kevin rose from the enlisted ranks to retirement as a Colonel in June 2018, serving in both active duty and reserve components. He was commissioned as a Second Lieutenant in 1988 and served as a combat arms officer throughout his career.

Kevin commanded at every echelon - Battery, Battalion, and Brigade - demonstrating an uncommon breadth of leadership responsibility. In each command role, he was responsible for the welfare, discipline, and operational readiness of those under his command, often in demanding and high-pressure environments. His leadership was marked by an ability to build cohesive teams, maintain discipline, and lead authoritatively under complex and evolving conditions.

Kevin's combat service includes a deployment to Iraq from 2006 to 2007 in support of Operation Iraqi Freedom. During this deployment, he conducted counterinsurgency operations during one of the most volatile periods of the war. For his actions and leadership in theater, Kevin was awarded the Bronze Star Medal.

In 2014 and 2015, Kevin deployed again, serving as the Deputy Commander for the Joint Special Operations Air Component Command. In that role, he oversaw air operations supporting Special Operations Forces across the Middle East during the campaign to defeat ISIS. His performance and leadership in this critical position earned him the Legion of Merit. He later received a second Legion of Merit in recognition of his outstanding leadership following a successful brigade command.

Upon his retirement from the Army in June 2018, Kevin was awarded the Defense Superior Service Medal, one of the highest peacetime military decorations, recognizing exceptionally superior service in a position of significant responsibility. This final award reflected the cumulative impact and quality of his thirty-seven years of honorable service.

Beyond rank and decorations, Kevin's military career gave him a deep sense of purpose and identity. He describes the camaraderie formed with fellow service members - built through shared hardship, danger, and sacrifice - as among the most

meaningful relationships of his life. He remains proud that his service contributed to a mission greater than himself and aligned with the values of duty, honor, and country.

Kevin's service also came with significant personal cost. Extended deployments required long separations from family and imposed emotional strain on both him and his loved ones. Combat environments exposed him to constant risk, psychological stress, and the heavy responsibility of command. He endured harsh living conditions, exhaustion, and sustained operational pressure while maintaining responsibility for others' lives and mission success. Kevin sustained injuries during his service, which are addressed separately in this report.

Despite these sacrifices, Kevin remains unequivocal in his commitment to his service. He states that he would do it all again and views his military career as an honor and a privilege. His thirty-seven years in uniform reflect sustained dedication, personal sacrifice, and a lifelong commitment to serving his country.

*Analysis*

Kevin's military service is a central component of his history and characteristics and is directly relevant under 18 U.S.C. § 3553(a)(1). His thirty-seven years of honorable service, culminating in retirement at the rank of Colonel, reflect a lifetime of responsibility, discipline, and commitment to lawful authority.

Few defendants appear before the district court with a record of sustained service at this level, involving both combat leadership and senior operational command.

Kevin's career required adherence to strict ethical standards, accountability for subordinates, and decision-making under extreme pressure. These experiences are indicative of a person who understands responsibility, consequences, and the gravity of misconduct. His service record strongly supports the conclusion that the offense conduct in this case represents a deviation from an otherwise law-abiding life rather than a pattern of disregard for the law.

Under § 3553(a)(2), Kevin's history of service also bears on the need for deterrence and protection of the public. His demonstrated capacity for discipline, compliance, and leadership significantly reduces the likelihood of future criminal conduct. The structure, accountability, and values ingrained over decades of military service are powerful factors that weigh in favor of rehabilitation rather than punishment through incapacitation.

The personal sacrifices associated with Kevin's service further inform the district court's assessment of just punishment. His repeated deployments, exposure to combat, separation from family, and physical injuries represent costs already borne in service of the nation. While military service does not immunize a defendant from accountability, § 3553(a) permits the district court to consider such

service when determining what sentence is sufficient but not greater than necessary.

Kevin's military career reflects exceptional dedication to public service, leadership under extraordinary circumstances, and a lifelong commitment to duty. These factors strongly support a sentencing outcome that recognizes accountability while giving due weight to the unique and substantial contributions Kevin has made to his country over nearly four decades.

<u>Physical Condition</u>

Kevin has a documented history of chronic medical conditions and service-related injuries arising from decades of military service and subsequent civilian work in national defense.

Kevin has been diagnosed with Type 2 diabetes, which he manages through prescribed medication. His daily medication regimen includes telmisartan, amlodipine besylate, tirzepatide, and atorvastatin, prescribed to manage blood sugar levels, blood pressure, and cholesterol. These conditions require ongoing medical monitoring and consistent access to treatment.

In 2007, while deployed to Iraq during combat counterinsurgency operations, Kevin was injured when his vehicle was struck on the right side by an improvised explosive device. The blast rendered him unconscious for several minutes. He was immediately evacuated from the scene and transported to a United

States military medical facility, where he was monitored for approximately twenty-four to forty-eight hours before being medically cleared and returned to combat operations. Following the incident, Kevin experienced severe headaches and tinnitus but did not pursue further treatment due to his on-going military requirements.

In 2018, the Department of Veterans Affairs formally diagnosed Kevin with a traumatic brain injury related to the 2007 blast incident. Since that diagnosis, Kevin has experienced symptoms including memory loss, cognitive impairment, persistent headaches, dizziness, and difficulties with emotional regulation, all consistent with the long-term effects of mild-to-moderate traumatic brain injury.

In June 2022, Kevin suffered another serious medical episode while working at United States Central Command. He lost consciousness, fell, and struck the back of his head, sustaining an open scalp laceration with significant swelling. He was hospitalized at Tampa General Hospital, where imaging revealed a benign meningioma located in the right frontal lobe of his brain. Meningiomas are non-cancerous tumors arising from the meninges, the protective membranes surrounding the brain and spinal cord. Although typically slow-growing, such tumors can produce significant neurological effects due to pressure on surrounding brain structures.

Kevin currently receives disability benefits from the Department of Veterans Affairs, which recognizes the lasting impact of his service-related injuries and medical conditions.

*Analysis*

Kevin's medical history is relevant to sentencing under 18 U.S.C. § 3553(a), which directs the district court to consider the history and characteristics of the defendant, as well as the need for the sentence imposed to provide medical care in the most effective manner. His health conditions are documented, service-connected injuries with ongoing effects.

Kevin's traumatic brain injury, sustained in combat and formally recognized by the VA, is particularly significant. TBI can affect memory, cognitive processing, emotional regulation, and stress tolerance. These impairments provide important context for understanding Kevin's functioning and decision-making, particularly under pressure. While his medical conditions do not excuse his conduct, § 3553(a) permits the district court to consider how such conditions bear on culpability, rehabilitation, and the appropriate form of punishment.

Kevin's chronic conditions, including diabetes and cardiovascular risk factors, require regular medical oversight and medication management. Section 3553(a)(2)(D) specifically instructs district courts to consider whether a sentence provides needed medical care in the most effective manner. Continuity of care,

access to specialists, and stable treatment are especially important for individuals with complex neurological and metabolic conditions.

Kevin's medical history also informs the district court's assessment of what punishment is sufficient but not greater than necessary. His injuries and health limitations are a direct consequence of decades of military service, including exposure to combat. A sentence that accounts for these realities while still imposing accountability aligns with the statutory goals of sentencing more effectively than one that unnecessarily disrupts ongoing medical care.

Kevin's service-related injuries and chronic medical conditions weigh in favor of a sentencing approach that recognizes both accountability and the practical realities of his health, consistent with the factors set forth in § 3553(a).

Mental and Emotional Health

Kevin suffers from service-related post-traumatic stress disorder (PTSD), a condition that stems directly from his combat deployments to Iraq from 2006 to 2007 and again from 2014 to 2015. During these deployments, Kevin was exposed to sustained violence, life-threatening situations, and repeated high-stress combat operations that have had a lasting impact on his mental and emotional well-being.

While deployed, Kevin witnessed extreme and disturbing events. He observed executions carried out at close range and heard the screams of individuals who had suffered severe and traumatic injuries, including one man who had been

badly burned. In the course of his duties, Kevin was required to take lives in defense of his team and mission, while also facing repeated threats to his own life. These experiences left a deep psychological imprint and contributed to ongoing feelings of survivor's guilt and moral injury.

Kevin has never required inpatient mental health treatment and has never experienced suicidal ideation. However, he continues to struggle with PTSD symptoms daily. These include intrusive memories, flashbacks, nightmares, and a tendency to avoid thinking about or discussing traumatic events. He also experiences depression, irritability, anger, guilt, and shame, along with difficulty concentrating and sleeping. Kevin takes prescribed medication to help manage his symptoms, but he does not currently participate in regular counseling or therapy. He completes daily devotionals, reads the Bible, and attends support meetings.

In addition to the trauma of combat itself, Kevin has experienced the loss of fellow service members, which has compounded his grief and emotional burden. These losses, combined with his combat experiences, have followed him beyond the battlefield and remain a persistent part of his life.

*Analysis*

Kevin's mental health history is directly relevant under 18 U.S.C. § 3553(a), which instructs the Court to consider both the history and characteristics of the defendant and the need for the sentence imposed to provide appropriate treatment.

His PTSD is service-related and rooted in documented combat exposure during multiple deployments.

The symptoms Kevin experiences - intrusive memories, emotional dysregulation, impaired sleep, and difficulty concentrating - are consistent with long-term combat-related trauma. These conditions provide important context for understanding how Kevin processes stress, conflict, and pressure. While PTSD does not excuse criminal conduct, § 3553(a) permits the district court to consider how such conditions affect judgment, emotional regulation, and coping mechanisms, particularly when those conditions arose from honorable service to the country.

Kevin's mental health history also bears on the goals of rehabilitation and public safety. He has demonstrated insight into his condition and has taken steps to manage symptoms through prescribed medication. His lack of inpatient treatment or suicidal ideation reflects stability rather than risk, and there is no indication that his PTSD renders him dangerous or unable to comply with supervision. To the contrary, structured support and access to appropriate mental health services would meaningfully address his symptoms and reduce the likelihood of future difficulties.

Section 3553(a)(2)(D) specifically recognizes the importance of providing mental health care in the most effective manner. In Kevin's case, continuity of care, access to trauma-informed treatment, and stability are better achieved in a

community-based setting than through incarceration, which risks making PTSD symptoms worse and disrupting existing coping mechanisms.

When considered along with Kevin's long record of lawful conduct, military service, and family support, his mental health history supports a sentencing approach that balances accountability with treatment and stability. Such an approach is consistent with the statutory framework and reflects a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

<u>Substance Abuse</u>

Kevin has no history of substance abuse or addiction. He had limited experimentation with marijuana during high school but has not used marijuana since that time and has never used any other illegal substances.

Kevin's relationship with alcohol has been consistently moderate and responsible. His use has been rare and limited over the course of his adult life, and he has no history of excessive or problematic drinking. In fact, Kevin has not consumed alcohol at all for more than a year.

Throughout his life, Kevin has not exhibited patterns of dependency, abuse, or habitual use of any substances, including alcohol, tobacco, or prescription medications. He has not engaged in behaviors associated with substance misuse and maintains a lifestyle free from compulsive or harmful habits.

*Analysis*

Kevin's substance use history is relevant under 18 U.S.C. § 3553(a), particularly in assessing his history and characteristics and the need to protect the public from further crimes. The absence of any meaningful substance abuse history weighs strongly in his favor and distinguishes him from defendants whose conduct is driven or made worse by addiction.

Kevin's limited experimentation with marijuana occurred decades ago during adolescence and was not followed by continued use or escalation. His lifelong pattern of minimal alcohol consumption, including complete abstinence for more than a year, reflects consistent self-regulation and sound judgment. There is no indication that substance use played any role in the offense conduct or that treatment for substance abuse is necessary to reduce the risk of recidivism.

Under § 3553(a)(2), the goals of deterrence, public safety, and rehabilitation do not require substance abuse intervention in Kevin's case. His clean substance use history supports the conclusion that he can comply with conditions of supervision and maintaining lawful behavior without the need for monitoring or treatment related to substance use.

Kevin's substance use history reinforces that the offense conduct represents an isolated deviation rather than behavior rooted in addiction or impaired judgment. This history supports a sentencing approach focused on accountability

and rehabilitation without imposing unnecessary conditions or restrictions unrelated to his actual risk factors.

<u>Educational and Vocational Background</u>

Kevin graduated from Arlington High School in Indianapolis, Indiana, in 1981. His school years were marked by a positive and well-rounded experience. He reports no history of bullying or serious disciplinary issues and recalls thriving in the school environment. Kevin participated actively in extracurricular activities, including football and wrestling, where he developed early skills in teamwork, discipline, perseverance, and leadership.

Immediately after high school, Kevin enlisted in the United States Army. His decision was motivated both by a desire to serve his country and by a commitment to furthering his education. While stationed at Fort Benjamin Harrison, he began taking college courses through a satellite education program and earned an associate degree in criminology from Vincennes University in Indiana.

Kevin continued his education throughout his military career. In the 1990s, he earned a bachelor's degree in business from Oakland City University through a satellite program. His pursuit of higher education continued while balancing increasing military responsibilities. In May 2010, while stationed at Fort

McPherson, he completed a Master of Business Administration degree from Central Michigan University, with a concentration in leadership.

In 2013, Kevin attended the United States Army War College in Carlisle, Pennsylvania, where he earned a Master of Strategic Studies degree. This program prepared him for senior-level leadership and strategic decision-making in the military and reflected the Army's confidence in his intellectual and leadership capabilities.

Kevin's educational history reflects sustained academic achievement and a long-term commitment to learning that complemented and supported his military service.

*Analysis*

Kevin's educational background is relevant under 18 U.S.C. § 3553(a) as part of his history and characteristics and in evaluating his capacity for rehabilitation and lawful conduct. His academic record reflects discipline, persistence, and intellectual engagement over an extended period, often while managing demanding professional responsibilities.

Kevin's pursuit of education while in full-time military service demonstrates planning, self-discipline, and respect for institutional rules and expectations. These qualities are directly relevant to the district court's assessment of his likelihood of

complying with conditions of supervision and responding positively to structured direction.

His advanced degrees, including graduate-level education focused on leadership and strategic studies, further reflect his ability to exercise judgment and accept responsibility. These attributes weigh in favor of a sentencing approach that emphasizes accountability through supervision and structure rather than unnecessary confinement.

Under § 3553(a)(2), Kevin's educational history supports the conclusion that he is well-positioned for rehabilitation and continued lawful contribution to society. His record reflects long-standing engagement with institutions that demand accountability and ethical conduct.

Kevin's educational achievements reinforce that the offense conduct represents an aberration in an otherwise disciplined and productive life. This history supports a sentence that is sufficient but not greater than necessary to meet the purposes of sentencing.

<u>Employment Record</u>

The cornerstone of Kevin's employment history is his thirty-seven-year career in the United States Army, during which he served with distinction and rose from enlisted service to the rank of Colonel. His military career, which included

command roles at every level and multiple deployments, shaped his professional identity and instilled in him a deep sense of duty, discipline, and leadership.

Kevin's transition from military service to civilian employment was seamless. He left active duty on a Friday and reported to work the following Monday in civilian attire, continuing to work alongside many of the same professionals and within the same strategic environment. This continuity allowed him to preserve institutional knowledge and maintain operational effectiveness without interruption.

Until recently, Kevin was employed as a civilian with the Department of the Air Force at the GS-14 level. In this senior role, he served as a senior planning analyst responsible for long-range strategic strike planning at a four-star warfighting headquarters within United States Central Command. The position carried significant responsibility and required sustained high performance. Kevin routinely worked a minimum of eighty hours per biweekly pay period, often exceeding that threshold based on operational demands and international travel requirements. His duties required a Top-Secret security clearance, which he held prior to the current investigation.

In October 2025, Kevin began working with Nine Line Medical in Tampa, Florida, a veteran-owned company. His responsibilities included business

development, with a focus on securing contracts with the Department of Veterans Affairs and the Department of Defense.

Earlier in his career, from 2001 to 2003, while still on active duty, Kevin also worked with International Truck and Engine Corporation in the Advanced Manufacturing Engine Engineering Group based in Indianapolis, Indiana. In that role, he oversaw the complete installation of a V6 sub-assembly manufacturing line in Melrose Park, Illinois. His responsibilities included identifying and selecting a manufacturing vendor capable of delivering a turnkey solution and managing the successful launch of the line. Kevin performed this civilian role while simultaneously fulfilling his military duties.

*Analysis*

Kevin's employment history is directly relevant under 18 U.S.C. § 3553(a), particularly in evaluating his history and characteristics and the likelihood of future lawful conduct. His professional life reflects decades of sustained responsibility, reliability, and service at the highest levels of both military and civilian organizations.

Kevin's ability to transition immediately from active-duty service into a senior civilian role in national defense underscores his professionalism trustworthiness. His GS-14 position involved strategic planning at the highest operational levels.

His continued employment in veteran-focused civilian work further reflects a desire to remain engaged in lawful, service-oriented endeavors. Even while facing the current charges, Kevin has not disengaged from work or responsibility, but instead has remained professionally connected, subject to administrative leave.

Under § 3553(a)(2), Kevin's employment history weighs heavily in favor of rehabilitation rather than incapacitation. His demonstrated work ethic, leadership experience, and long-standing compliance with institutional expectations strongly indicate that he can conform his conduct to the law and responding appropriately to supervision.

Kevin's employment record reflects a lifetime of lawful productivity and public service. This history supports a sentencing approach that recognizes accountability while preserving Kevin's ability to continue contributing meaningfully through lawful employment, consistent with a sentence that is sufficient but not greater than necessary.

<u>Prior Custodial History</u>

Kevin has no history of incarceration. He has never served a single day in jail or prison. Until the present case, he has lived his entire life without experiencing confinement of any kind.

The experience of being charged, entering a guilty plea, and awaiting sentencing has been profoundly difficult for Kevin. The process itself has carried

significant emotional weight, including anxiety, uncertainty, and the loss of professional standing. As a result of the charges, Kevin has lost his employment and has suffered reputational harm within both his professional and personal communities. These consequences have occurred before any sentence has been imposed and have already altered the course of his life.

*Analysis*

Kevin's lack of any prior incarceration is a significant consideration under 18 U.S.C. § 3553(a), particularly in evaluating his history and characteristics. For an individual who has never spent even a single day in confinement, incarceration - of any length - represents a severe and destabilizing punishment rather than a marginal escalation in sanction.

Courts have long recognized that first-time incarceration carries a unique and disproportionate impact. For Kevin, who has spent nearly four decades in positions of responsibility, leadership, and public trust, the experience of imprisonment would be especially punitive. The psychological and emotional effects of confinement on a first-time offender are substantial and extend far beyond the duration of the sentence itself.

In addition, § 3553(a)(2) requires the district court to consider whether imprisonment is necessary to achieve deterrence, promote respect for the law, or protect the public. In Kevin's case, the record reflects that those goals have already

been substantially served. The ordeal of criminal prosecution, the decision to plead guilty, the loss of employment, and the damage to his professional reputation have imposed serious consequences and served as powerful deterrents against future misconduct.

Kevin is not someone for whom incarceration is necessary to prevent recidivism or protect the public. His life history demonstrates stability, discipline, and long-term compliance with legal and institutional rules. A sentence of imprisonment would add punishment, but it would not meaningfully advance rehabilitation or public safety.

When considered considering Kevin's lack of prior criminal history, his extensive service to the country, and the significant collateral consequences he has already endured, a custodial sentence is not necessary to achieve the purposes of sentencing. A non-incarceration sentence would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment, while avoiding punishment greater than necessary under § 3553(a).

### The Kinds of Sentences Available
### and the Need to Avoid Unwarranted Disparity.
### 18 United States Code Sections 3553(a)(3) and (a)(6)

*United States v. General David Petraeus,*
*Docket Number 3:15-CR-47-DCK (WDNC)*

This federal criminal court case stemmed from an extra-marital affair between General David Petraeus and his then biographer Paula Broadwell. The

FBI learned of General Petraeus' extra-marital affair (General Petraeus denied this affair occurred while he was active military) when a third person, Jill Kelley, accused Ms. Broadwell of cyberstalking with unauthorized access to classified information.

## Information

On March 3, 2015, a single-count information charged that, between August 2011 and April 5, 2013, General Petraeus, being an employee of the United States, and by virtue of his employment, became possessed of documents and materials containing classified information of the United States, and unlawfully and knowingly removed them without authority and with the intent to retain them at unauthorized locations, aware that these locations were unauthorized for the storage and retention of such classified documents and materials, in violation of 18 U.S.C. § 1924.

## Penalties

The statutory penalty for a violation of this statute, a Class A Misdemeanor, is a maximum term of one year imprisonment, a $100,000 fine, or both, a special assessment of $25, and no more than five years of probation.

## Plea Agreement

On March 3, 2015, a plea agreement was filed, under which General Petraeus agreed to plead guilty to the sole count of the information. The

government and General Petraeus agreed to the following sentencing guideline applications:

| Guideline | Level |
|---|---|
| Base Offense Level § 2X5.2 | 6 |
| Abuse of Position of Trust § 3B1.3 | +2 |
| Obstruction of Justice § 3C1.1 | +2 |
| Acceptance of Responsibility § 3E1.1 | -2 |
| Total Offense Level | 8 |

The government agreed not to oppose a non-custodial sentence, and the parties agreed to recommend a two-year term of probation and a $40,000 fine. Further, the government agreed not to bring any additional criminal charges against him in the district of prosecution or any other district.

*Factual Basis*

The parties filed a detailed fifteen-page factual basis in connection with the plea agreement. A few pertinent facts are summarized as follows:

Throughout his employment by the Department of Defense (hereafter, DOD), General Petraeus entered into several agreements regarding the protection and proper handling of classified information. In each agreement, he promised never to disclose such information without prior authorization, and he

acknowledged that unauthorized retention or disclosure of such information could cause irreparable injury to the United States and could be used to advantage by a foreign nation.

General Petraeus retired from the DOD on August 31, 2011, after which time he retained his continuing lifelong obligation to protect the classified information he had been granted access to while employed by the DOD. On November 9, 2012, General Petraeus resigned from the Central Intelligence Agency (hereafter, CIA), having signed a non-disclosure agreement (hereafter, NDA) and secrecy agreement like those he signed when he was with the DOD.

During his tenure with the DOD and CIA, General Petraeus held a security clearance allowing him access to classified material, and he had regular access to such material relating to DOD and CIA programs, operations, methods, sources, and personnel. During his tenure with the military, General Petraeus maintained notebooks about his daily schedule and classified and unclassified notes he took during official settings. These notebooks contained information about covert officer identifications, war strategy, intelligence capability, diplomatic discussions, code word information, and notes relating to discussions from high-level National Security Council meetings and discussions with the President of the United States.

From July 2009 until July 2012, General Petraeus's DOD historian gathered and organized classified materials General Petraeus had collected during his DOD

tenure. General Petraeus never provided his notebooks to the historian and instead personally retained them. Having agreed to provide his notebooks to his biographer, General Petraeus sent them to a private residence in D.C., where his biographer was staying. The residence was not approved for storage of classified information, yet General Petraeus left them there for several days to facilitate his biographer's access to them to be used as source material for General Petraeus's biography. No classified information appeared in the biography. After several days, General Petraeus retrieved the notebooks and returned them to his home in Virginia. The Sensitive Compartmented Information Facility (hereafter, SCIF) that was in General Petraeus's residence had been closed, de-accredited, and moved, so his residence was no longer approved for storage of classified information.

On April 5, 2011, the FBI executed a search warrant at General Petraeus's residence and seized the black books from an unlocked desk drawer in the first-floor study.

On June 12, 2012, in two separate interviews with the Federal Bureau of Investigation (hereafter, FBI), General Petraeus acknowledged that he understood making false statement to the FBI during a criminal investigation was a crime. In October 2012, FBI agents interviewed General Petraeus during a criminal investigation. During that interview, General Petraeus stated that he had never

provided classified information to his biographer and that he had never facilitated the provision of such information to his biographer. These statements were false.

*Sentencing Pleadings*

General Petraeus' attorneys filed a lengthy sentencing memorandum (hereafter, memo), which included details about his personal background, including his military service, among other information. The memo pointed out that imprisonment is rarely imposed in cases like these except where there is a charge for another criminal offense. The memo provided a long list of such cases in which probation was imposed. It also pointed out that the government did not oppose General Petraeus's request for a noncustodial sentence.

Finally, the memo contained an Appendix with letters from many government and military officials, including former British Prime Minister Tony Blair, Senator Diane Feinstein, Senator Lindsey Graham, and Senator Joseph Lieberman, to name only a few.

Interestingly, the government did not file a sentencing memorandum.

*Sentencing*

On April 23, 2015, United States Magistrate Judge David Keesler sentenced General Petraeus to a two-year term of probation and a $100,000 fine.

In his statement of reasons, Judge Keesler determined a final offense level of 8, a criminal history category of I, and a guideline imprisonment range of 0 months

to 6 months, which was consistent with the stipulated guideline applications in the plea agreement.

Judge Keesler justified his sentence as follows:

"The Court ordered a sentence of two years' probation and found this sentence to be sufficient, but not greater than necessary to accomplish the sentencing objectives of 18 U.S.C. § 3553(a), including the need for the imposed sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and provide protection to the public. The court noted the need to balance competing concerns: (1) the seriousness of the offense, including an abuse of a position of trust and obstruction of justice, with (2) a 37-year record of service and high achievement as a military officer. In addition, the court referenced the multiple letters provided by defense counsel, noting that these letters attest to the defendant's military service and provide a description of an individual considered by many to be one of the finest military officers of his generation. The court also imposed the maximum fine allowed by statute. The court ordered a $100,000 fine based on the need for the combined sentence to reflect the seriousness of the offense, as well the need to promote respect for the law, provide just punishment, and afford adequate deterrence. When determining the appropriate fine, the court balanced the 18 U.S.C. § 3553 factors with the defendant's ability to pay a fine, and noted that the fine, when taken together with other sanctions, should be punitive."

*Analysis*

The federal case of General David Patraeus is relevant and significant when contrasted with the charges to which Colonel Luke pled and the advisory federal sentencing guideline imprisonment range Colonel Luke, a similarly situated defendant, faces at his sentencing hearing.

## Sentencing Recommendation

Kevin Luke appears before the district court as someone whose life has been defined by responsibility, service, and lawful conduct. He was raised in a stable and supportive family environment, built enduring relationships with his children and family, and spent nearly four decades in uniform serving his country at the highest levels of trust and responsibility. His military career - marked by combat deployments, command at every echelon, and receipt of some of the nation's highest military honors - reflects extraordinary dedication, discipline, and sacrifice. Following retirement, he continued to serve the public in demanding civilian roles within national defense, maintaining consistent and productive employment throughout his adult life.

Kevin has no history of criminal convictions and has never spent a single day in jail. He has no history of substance abuse or addiction. His record reflects restraint, stability, and respect for the law over many decades. The offense conduct stands in stark contrast to the life he otherwise lived and represents a marked deviation, not a pattern. The consequences he has already suffered - including the loss of employment, reputational harm, and the emotional toll of prosecution - have imposed significant punishment and serve as powerful deterrents against future misconduct.

Kevin's service-related injuries and mental health conditions further inform the district court's sentencing determination. His traumatic brain injury and combat-related PTSD are documented consequences of his military service and continue to affect his health and daily functioning. While these conditions do not excuse his conduct, they provide important context and underscore the appropriateness of a sentence that emphasizes treatment, structure, and accountability rather than unnecessary incarceration. Nothing in the record suggests that Kevin poses a danger to the public or that confinement is necessary to protect society.

Finally, § 3553(a)(6) directs the district court to consider the need to avoid unwarranted sentencing disparities among defendants who have engaged in similar conduct. In this sentencing memorandum, the Defendant outlines the disposition of a similarly situated defendant, *United States v. Petraeus*, and contrasts that outcome with the significantly harsher sentence Kevin now faces for comparable conduct. The comparison underscores a broader concern: similarly situated defendants should not receive markedly different sentences absent meaningful distinctions. Avoiding disparity is essential to promoting fairness and respect for the law.

Considering the nature and circumstances of the offense, Kevin's history and characteristics, the need for just punishment and deterrence, and the importance of

proportionality under 18 U.S.C. § 3553(a), a sentence that does not include incarceration is sufficient to achieve the purposes of sentencing.

Such a sentence would hold Kevin accountable while recognizing his extraordinary service, his otherwise exemplary life, and the reality that this case represents an aberration rather than who he is.

## IV. Requests for Judicial Recommendations

The Defendant understands judicial recommendations are just that – mere judicial recommendations.[3] The Defendant understands there is no guarantee that a judicial recommendation will result in action. However, relevant law (The Fair Sentencing Act of 2018) and Bureau of Prison policy both state that more weight is given to a judicial recommendation if there is a factual basis on the record for the judicial recommendation.[4]

The Defendant therefore makes the following request for a judicial recommendation and in support offers a supporting factual basis.

---

[2] The Bureau of Prisons welcomes judicial recommendations and, by statute and its own policy, is required to consider them. *See* 18 U.S.C. Section 3621 and Program Statement 5100.08, "Inmate Security Designation and Custody Classification". Pursuant to the above statute, the Bureau of Prisons is required to consider the type of offense, the length of sentence, the defendant's age, the defendant's release residence, the need for medical or other special treatment, any placement recommendation made by the court, and all guidance issued by the United States Sentencing Guidelines. Therefore, while the Bureau of Prisons has the sole authority to designate the place of confinement for federal prisoners, if a defendant's judgment and conviction indicates the district court's preference for housing the inmate within a specific institution, geographic area, or specialized program, it must be considered, and every effort will be made to fulfill the district court's recommendation request should there be reasons on the record to support the request.

A.     Prison Location

One of the professed goals of incarceration is rehabilitation. Frequent family visits will allow the Defendant a better opportunity to successfully matriculate through her imposed prison sentence. Frequent visits will also provide short-term and long-term benefits to the Defendant and to the community to which she will ultimately return.

Should the Defendant be sentenced to term of imprisonment, the Defendant requests a recommendation of the federal prison as close as possible to Tampa, Florida. As a factual basis for this recommendation, the Defendant's family and friends reside in greater Tampa, Florida. The Defendant respectfully requests a prison location as close to the Tampa, Florida as possible.

## <u>CONCLUSION</u>

WHEREFORE, the Defendant, KEVIN CHARLES LUKE, by and through her undersigned counsel prays this Honorable Court will grant the requested relief and/or any other relief deemed necessary.

Respectfully submitted,

<u>By: /s/ Mark J. O'Brien</u>
Mark J. O'Brien, Esquire
Florida Bar No.: 0160210
511 West Bay Street
Suite 330
Tampa, Florida 33606
T:      (813) 228-6989
E:      mjo@markjobrien.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on February 6, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will then send notice of electronic filing to all counsel of record.

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire